Judge Robertson
delivered the opinion of the Court.
On the 2d of May, 1817, the defendants, as the heir of Kobert Bell, deceased, filed their bill in *399 chancery, against Joseph Pugh, alleging in substahcé, that some time before 1789, (blit at what particular time does not appear,) Rankin, Pugh and Bell, (their ancestor,) purchased from Holsey 330 acres of land, in the now county of Bourbon, which Holsey had bought from Hoy, and Hoy from Miller, the patentee, and of which a division was made among them by demarcation of boundaries, assigning to Rankin 130-acres, and to Pugh and Bell 100 acres each, for which each of them paid to Holsey the consideration, and on which each settled in 1789. That Rankin sold his interest in the said joint purchase to Shawan, who settled on the 130 acres, and who, or those claiming under him, enjoyed the possession ever since. That Bell made valuable improvements on his 100 acres, and died in 1791, in the undisturbed possession, leaving a widow and four infant children; (the defendants in error,) that before the death of Bell, to-wit, in 1789, finding that Holsey could make no title, Rankin, Pugh and Bell went to Hoy,in company with Holsey, and at his instance, to endeavor to obtain the title. That Hoy executed a bond for the conveyance to them, of the land, which was deposited with Pugh. That the division was then made, and the purchasers settled on the tracts respectively assigned to them. That the wfidow and children of Bell continued to reside on the 100 acres allotted to him, until 1802, when (she having in the mean time intermarried with Smith,) they all removed to the state of Tennessee, where the appellees resided during their minority. That Pugh had obtained a deed to himself, from Miller, the patentee; for his own and for Bell’s 100 acres, had taken possession of, and occupied and wasted the land, and refused to convey to the appellees their father’s 100 acres, or to account to them for its Use and value. A conveyance of the legal title to the 100 acres, and rents and profits, are asked for by the bill.
Pugh’s air-8wer‘
Pugh, in his answer, admits the joint purchase, in substance; admits that he had .obtained from Miller the legal title to two hundred acres, but insists on the statute of frauds and perjuries, alleging that the contract with Holsey was only verbal, and he says that after Bell’s death and his widow’s intermarriage,, he ascertained that the legal title was in Miller, who *400 claimed a small balance of about $165, as due to bibi from Hoy, and would not make a title until the payment of that sum. That Shawan agreed to pay $05, and he (Pugh) and Smith agreed to pay $50 each; whereupon Miller executed to Shawan a deed for his 130 acres; but as Smith could not get a deed without giving security for the $50, which he was to pay, he (Püghj became his security, and took the deed in his own name, as an indemnity. He insists that the defendants in error had no right to any portion of the land; that it had belonged to Smith, in equity, and that he held Smith’s bond for il, dated after the date of the said deed; and that the defendants having complained, that they were likely to bd injured, he had paid them $40 each, in consideration of which, they had executed writings, binding them to release all claim to the land.
Proof in the cause.
Eevivor of the suit vs. Pugh’s and Chiles’ heirs.
Interlocutory andfinal decree
The allegations bf the bill; so far as they are mate^ rial, are abundantly proved; in addition to which, it is proved that, at the date of the contract with the defendants in error, they were infants; that Smith had paid Miller the $50, but that Miller would not receive it until Smith acknowledged that he made the payment for the benefit of the infant children, and would hold the land in their right, and for them, Miller observing that “the zoidozu’s and orphan’s curse should never light on his head.”
Pugh having died after filing bis answer, the suit, by regular revivor, was prosecuted against his heirs, one of whom (Mrs. Chiles,) having died, an order was made for reviving against her heirs.
The court made an interlocutory decree for a conveyance to the defendants in error, of the land assigned to and occupied by their father, and fot the assessment of rents and improvements. The commissioners assessed the rents from the time that Pugh tobk possession of the land, and allowed him, for his improvements^ their value when made; and there being a balance in favor of the defendants, for excess of rent, over the estimate for improvements, a final decree ratified the report, and gave Pugh’s heirs credit for the amount received by the defendants from Pugh.-
rora,,
Thecircumtw^oase ere-ate a result-' ing trust. No imitation ™stui trust, and the truatee»
No limitation apar Py,6 seeking" reiief against fraud, until ara®rd iaefu]. ly discovered barred, the claim to mesxhe^noident follows the principal,
*401 The plaintiffs in error assign several errors to this decree, the chief of which are, that there is a defect of parties. That the lapse of time and the statute of frauds and perjuries, oppose an insurmountable barrier to a decree for the appellees, and that it was not proper to allow rents and profits. There are other objections urged, but they are so minute and unsubstantial, that it would be a waste of time to notice them.
We know of no principle of equity, nor of any authority, which could apply any limitation to this case, Whatever right Beil’s heirs may have to relief, .it is purely equitable, and results from an implied trust, The purchase of the land by Robert Bell; the payment of the price to his vendor; the execution of the bond to his use and for his benefit, and its deposit with Pugh, created, by implication of law, a trust between him and Pugh; and as soon as Pugh obtained the deed from the patentee to hirnself, a trust resulted in favor of Bell’s heirs. 1 Atk. 59-385; 2 Ib. 75; 1 Pr. Wms. 780; 2 Mad. Ch’y. 96-7.
Such a trust will not result from a bare parol agreement, but there must be some palpable act done by the cestui que trust, on which to raise the implication* Such an act is the payment of money by himself, or by another to his use; and the first may be established by parol testimony. It must, however, be clearly proved. 2 Atk. 256; Ib. 71; 1 Pr. Wms. 607; 10 Vesey. 362-6; 3 Marshall, 24; Ib. 477.
In this case, not only are all the facts, necessary to create a trust satisfactorily proved, but they are admitted by Pugh, in his answer. It is true that he insists, that Smith paid a balance of ‡50, exacted by Miller, the patentee, and that thereby the right vested in Smith, for whom he held the deed, and from whom he afterwards purchased. But all this surely cannot change the case. Smith acquired no sort of right for himself; it was impossible that he could have done so. If he had attempted to do it, he would have been guilty of a most foul fraud, and his coadjutor, Pugh, would have been equally guilty, of a wicked attempt to despoil orphanage of its pittance. But Smith was not obnoxious to the imputation of fraud, in the first instance. It is abundantly proved that he made the *402 payment of tbe $50, .for the infants, and that Miller would not receive it, until this was acknowledged. The attempt afterwards, to sell to Pugh, is discredifable to Smith. Pugh knew that Smith had nothing to sell. 1-Iis pretext for holding the title as an indemnity for the $50, for which he was Smith’s security, and his attempt afterwards to hold it as a purchaser (rom Smith, are hardly reconcileable with both fairness and good sense. Besides, there is no evidence that Miller was entitled to any thing from Bell’s heirs, or that a title could not have been obtained without any payment to him.
It would be difficult to find, or to suppose, a case of an implied trust, belter established than this has been. And in addition to this, the whole ease is tinged with fraud; almost every circumstance in it, exhibits the mark of á conspiracy against the rights of infants.
The equity of the defendants in error being thus so well ascertained, how was it barred by time? They were infants, and had been carried out of the state. Twenty years had not elapsed, from the origin of their right. The statute of limitations does not apply, nor will the chancellor apply it, by analogy, either to ba.r the right to the land, or to compensation for rents and profits. The profits are incidental, and if the principal right is not barred, that which is incidental to it, cannot-be, in such a case as this, in which cestui que trusts, are the only parties complaining; and who seem to have been kept in ignorance of their rights, by Pugh and Smith, to whom they looked for information and advice, but who abused their confidence by endeavoring to deceive them.
It does not appear when all the defendants in error attained legal discretion. But it is probable that it was in 1810.
There is no limitation to a resulting trust; none will be applied (in equity) to fraud, until after it shall have been fully discovered. In this case there was fraud, on tbe rights of the defendants in error, and it was well disguised and long concealed, probably until a short time before this suit was brought. The equitable right to the land, therefore, was not barred by time, even if there had been no trust.
No limitation arrant*"9* whon the right accrued tlie mfcurt”
Statute of (,“e“ „otaPpiy to result-mg trusts, of pnor equity, will be comPelled to re'lease legal title.
*403 Nor is the right to profits affected by lapse of time. The defendants in ei ror could not have recovered rents before their right to the land was ascertained, arid were not bound to sue for them while they were infants, nor until they were informed of the gross impositions which had been practised on their credulity and destitution. But if there were no other reasons for withholding the application, in equity, of the limitation at law, to a recovery of mesne profits, the subsistanee of a resulting trust between the parties, would alone be sufficient for that purpose. As between trustee and cestui que trust, the limitation does not run either against the right to the land, or that to its incidental profits. It would be unreasonable to suppose that any of the rights subsisting in trust, could, between the parties to the trust, be barred by any statute of limitations at law, or by any analogy in equity to legal remedies, unless the right to the land is also barred. Whenever the cestui que trust can recover the land, he is, “pari ratione,” entitled to its profits. Thus the trust in this case, would save the right of the defendants in error, to all the rents which accrued.
But without even considering it as a technical trust, the right to the profits, during infancy, could not be barred by lapse of time. The rents accruing during minority, would not be barred, because infancy created a species of trust which will be protected by the cellor. “In the instance of a bill by an infant, to have possession of an estate, and an account of rents and profits, the court will decree an account from the time the infant’s title accrued; for every person who enters on the estate of an infant, is considered as entering as guardian or bailiff for the infant; and so says Littleton.” 1 Mad. Ch’y. 73; Dormer vs. Fortescue, 3 Atkins, 130; Patrick vs. Woods, 3 Bibb, 30.
In whatever aspect the case be received, therefore, the defendants in error have a just claim to rents from the time that Pugh took possession. We are at a loss to conjecture how the statute of frauds and perjuries can be applied to this case. This statute can have no application to resulting trusts. Besides, Bell had a bond for a title, and Pugh being its depository, obtain-e,d a deed, with, full knowledge of the equity of Bell’s *404 heirs. And on this ground, if there were no resulting trust, the heirs would be entitled to a release of the legal title.
One who purchases with notice of a prior equity, not within the occupant law, nor entitled to compensation for his improvements, by the common or civil law.
Rules for estimating rents and improvements according to the general principles of equity,
Smith had no title to the land, either in his own right or that of his wife.
As to the assessment of rents and improvements, there is some difficulty. The occupant acts do not apply to this question, in this case; nor can the equitable principle, adopted between a bona fide vendor and vendee, be the criterion between the parties here.
Pugh was not an innocent occupant, of land which he believed to be his own. He knew that he had no right to it in equity or conscience. His attempt to entrench himself behind a deed, improperly procured, and his subsequent purchase from Smith, and his contract with the defendants in error, while infants, (for the consideration of a trifle,) and from whom he must have withheld a knowledge of the nature and extent of their rights, are enough to deprive him of the equity of a bona fide possessor and improver. By the common law, he would not be entitled' to compensation for improvements. By the civil law, if he improved in good faith, believing the land to be his own, he would be entitled only to so much as his improvements may have added to the value of the land; but if he were a trespasser, or knew that he was making improvements on land which, in conscience he ought not to hold, he would not be entitled to reimbursement for even any accession of value, by the expenditure of his labor or money.
Neither the common nor civil law, as such, can decide this question. The chancellor, however, leans to the equitable principles of the civilian. And, therefore, in the absence of any more direct authority, the civil law should be consulted and respected by courts of equity.
This case stands on the general principle of equity, and must be tested by them alone. By these, (without some reason for exception,) the occupant is responsible for rents and profits during occupancy, and is entitled to the value of improvements, estimated at the time of making them. But if the occupant had no notice of the complainant’s title, or the complainant had *405 negligently or fraudulently postponed the assertion of his right, rents would be computed only from the filing of the bill. 1 Maddock, 73-4; and in such case the real value of the improvements, at the same time, should be awarded, however much it may exceed the amount of the profits. We are aware that this last position is opposed by the case of Green vs. Biddle, 8 Wheaton, 1; in which the supreme court say that improvements beyond the rents, ought nob bo be allowed. Ibis believed that no cases to the same extent, can be found, except those in which the occupancy was mala fide. And, therefore, we would restrict this general doctrine in Wheaton, to cases mala fide. Such is this case evidently.
When land is withheld, under a full knowledge of a superior equity, the occupant is bound to account for waste and deterioration as well as rents and profits, and can only ciaim the enhanced valué of the land as set off.
No person unless a-grieved, can complain of a decree or .judgment.
*405 Pugh’s heirs cannot object to being charged for rent on improvements made by their ancestor, because they are allowed pay for them at the cost when made. Ewing’s heirs vs. Handley, 4 Litt. Repts. 374. If they should be bound to pay rent, only for the land as it was when his occupancy commenced, then they can ask for improvements, no more than the accession of value, if any, to the land estimated without them. This we are inclined to think, is the just rule between these parties. But we presume that its application will not benefit Pugh’s heirs. As Pugh withheld the land improperly; as he was guilty of bad faith, and had full knowledge of the right of Bell’s' heirs, he should be responsible for all waste or deterioration; and for rents for the land estimated in their value, by the condition of the land when he took possession of it, He should be allowed nothing for improvements, unless they enhance the value of the land; and if they do, he should have no more than the accesión of such value. Such would be the rule of natural justice in such a case. Pugh, by his fraud or injustice, could not subject Bell’s heirs to liability to him for anjr improvements on their land, made without their consent, and which had not increased the value of the land. For ameliorations, he might have claim. But even this, according to the civil law, would be very doubtful, under the circumstances of this case.
If, however, Pugh be considered as a trustee without fraud or had faith, the rule established by the cir *406 cuit court would not be exceptionable. His heirs, therefore, cannot object to it, because itis more favorable to them, than that which must be applied, if this is not, and is the proper rule if their ancestor acted in good faith. The defendants in error have not objected to the decree for rents and improvements, therefore, it will not be reversed for the objections made by the plaintiffs in error.
The purchase of a trustee from cestui que trust will not be enforced in equity, when the consideration ia inadequate, and the cestui que trust, was ignorant of the extent of his rights.
When revivor by consent, decree not irregular, though no appearance, nor seryiee of notice upon those against whom revived.
Bibb, for plaintiffs; Mills and Denny, for defendants.
The alleged purchase from the defendants in error, is entitled to no consideration. They were infants; and if they had not been, the contract could not be enforced, because it was made with their trustee, fora greatly inadequate consideration, and must have been made without a knowledge by them of their rights.
But one of Pugh’s heirs (Mrs. Chiles,) died, “pen dente lite” and there is no evidence that the order of revivor was ever served on her heirs. There was no. appearance for them by guardian or otherwise. This casual omission does not affect the equity of the case. Nevertheless, it was premature to render a final decree before these heirs were before the court, by a guardian, ad litem, if they were infants. But there is no evidence that they were infants, and the revivor is by consent. This is, therefore, no objection to the decree. It was not necessary to make Holsey or the heirs of Hoy, parties; nor was it necessary to make Smith and his wife parties. It does not even appear whether they are living.
f The decree of the circuit court must be affirmed with costs and damages.